**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

– – – – – – – – – – – – – – – – – – – – – – – – – –x
:
CELLTRACE COMMUNICATIONS
LIMITED, and WAYNE MICHAELS,
:
:
Plaintiffs,
:
:
v.
:
:
ACACIA RESEARCH CORPORATION,
and ACACIA RESEARCH GROUP, LLC,
:
:
Defendants.
:
:
– – – – – – – – – – – – – – – – – – – – – – – – –x

Civil Action No. 15-cv-4746 (AJN)

**AMENDED COMPLAINT AND**
**DEMAND FOR JURY TRIAL**

***(REDACTED)***

Plaintiffs Celltrace Communications Limited and Wayne Michaels (collectively, "Plaintiffs") file this Amended Complaint against Acacia Research Corporation ("Acacia Research") and its subsidiary, Acacia Research Group, LLC ("ARG") (collectively, "Acacia" or "Defendants"), based upon personal knowledge as to their own actions and upon information and belief as to the actions of others.

## NATURE OF THE ACTION

1.      Plaintiffs, an innovative communications company and its founder, developed technological advancements in the SMS communications industry that resulted in the grant of U.S. and foreign patents. The Acacia Defendants tout themselves as leading experts in the patent enforcement and licensing arena. Acacia's senior management coaxed Plaintiffs into entrusting their intellectual property to Acacia with assurances of Acacia's expertise in patent enforcement and licensing. To win Plaintiffs' trust, Acacia's senior management also assured Celltrace that Acacia was a well-known, publicly traded company with a reputation for being trustworthy and ethical and that Acacia's mission was protecting inventors and recovering

maximum value for intellectual property.  Acacia made a series of empty promises to Plaintiffs, making hundreds of millions of dollars through such deceit.  Upon information and belief, Acacia never intended to honor these statements and promises, but rather sought to induce Plaintiffs to enter into a business relationship that would benefit only Acacia.  Instead of respecting the "anti-bundling" promise at the core of the parties' agreement, Acacia bundled Plaintiffs' valuable patents with many others – then licensed them all away and kept the proceeds.  This left Plaintiffs with no value for their years of investment or the consideration they provided to Acacia in good faith, under their agreement.  Plaintiffs' only remedy is to bring this lawsuit, to hold Defendants liable for their conduct and to recover the lost value of Plaintiffs' technology.

## PARTIES

2.     Plaintiff Celltrace Communications Limited is a company registered in England with an office at Poplars Farm, Crouch Lane, Winkfield, Berkshire, England SL4 4TL.

3.     Plaintiff Wayne Michaels is a citizen of the United Kingdom having a place of residence at Poplars Farm, Crouch Lane, Winkfield, Berkshire, England SL4 4TL.

4.     Defendant Acacia Research Group, LLC is a Delaware corporation having a principal place of business at 500 Newport Center Drive, Suite 700, Newport Beach, California 92660.  ARG is the successor to Acacia Patent Acquisition Corporation's rights and obligations. (Dkt. #10.)  Therefore, throughout the Amended Complaint, references to "ARG" include Acacia Patent Acquisition Corporation.

5.     Defendant Acacia Research Corporation is a Delaware corporation having a principal place of business at 500 Newport Center Drive, Suite 700, Newport Beach, California 92660.

**JURISDICTION AND VENUE**

6.     This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. §1332, as the parties are diverse and more than $75,000 is at stake in the dispute.

7.     This Court has personal jurisdiction over Defendants arising from a November 2007 agreement that is at the heart of this dispute.  In that agreement, Acacia consented to the exclusive jurisdiction of any New York state or federal court.  Furthermore, upon information and belief, Acacia conducts substantial business in this District, including pursuing business relationships and entering into agreements with third parties in this District, and licensing intellectual property to, and enforcing intellectual property against, third parties in this District.

8.     Venue is properly laid in this Court pursuant to 28 U.S.C. §1391.

**FACTUAL BACKGROUND**

A.     **Plaintiffs Invented and Patented Valuable Telecommunications Technology Used Worldwide.**

9.     Plaintiffs created new telecommunications systems and solutions for use with smart cards, mobile devices, and wireless networks. Plaintiffs invented a new communications platform and framework for interfacing with smart cards, as well as the mobile devices in which they reside, via the wireless networks already used by these mobile devices. This created a substantially enhanced SMS communications framework that permitted communication of multiple different types of messages over the same SMS channel.  For example, standard SMS text messages, commands, and other types of data and information could be remotely delivered to and received from the smart cards and their mobile devices.

10.     Plaintiffs' ESMS ("Enhanced Short Message Service") solution enabled a wide range of new functionalities, applications, and services for smart cards and mobile devices.

For example, Plaintiffs' ESMS framework allowed smart cards and handsets to be remotely and securely updated and/or reconfigured over the air to fix bugs and install upgrades. This technology also allowed network operators (and other parties) to deliver valuable new services, functionality, and content to their customers. Additionally, by using the existing telecommunications infrastructure and networks, Plaintiffs' ESMS solution enabled implementation of these new functionalities and services in a very efficient and low-cost manner.

11.    Plaintiffs protected their inventions and new technologies with a wide range of intellectual property rights. In particular, based on Plaintiffs' innovations, Celltrace Communications Limited was awarded a number of patents by the United States Patent and Trademark Office ("USPTO"), as well as other patent offices worldwide, which protect various aspects of Plaintiffs' ESMS and telecommunications technologies.

12.    The patents awarded to Celltrace Communications Limited include (i) U.S. Patent No. 6,011,976, entitled a "Telecommunications System with Value Added Service Directory and an Integrated Circuit Module Therefor," which was filed on June 15, 1994, and granted by the USPTO on January 4, 2000, and (ii) U.S. Patent No. 7,551,933 entitled, a "Telecommunications System," which was filed on August 9, 2002, and granted by the USPTO on June 23, 2009.

13.    Plaintiffs initially entered into an agreement with BTG PLC, a global technology commercialization entity, pursuant to which BTG would assist Plaintiffs in enforcing and monetizing Plaintiffs' patents. Ultimately, BTG decided to exit the telecommunication space and focus on the medical industry. As such, Plaintiffs and BTG sought to place Plaintiffs' patents with a new partner.

**B.     Plaintiffs and Acacia Sign the November 2007 Agreement.**

14.     Plaintiffs were referred to Acacia, and began negotiations that ultimately led to an agreement.

15.     From Plaintiffs' perspective, Acacia Research and ARG (then Acacia Patent Acquisition Corporation) were one entity – "Acacia."

16.     Numerous telephone conversations took place during 2007 between Plaintiffs and Acacia's representative David White, before the parties entered into an agreement.

17.     Before deciding to sign the November 2007 agreement, Acacia's David White told Mr. Michaels that Mr. Michaels could rely on and trust Acacia to represent Mr. Michaels' and Plaintiffs' best interests and maximize value for Plaintiffs.  Mr. White told Mr. Michaels on several occasions in 2007 that Acacia's business was to protect their inventors' intellectual property and financial interests and to maximize value for their inventors.  This, he explained, was how Acacia made their money – both parties would share in the revenue stream. Mr. White emphasized that it was in Acacia's own interest to maximize value for their inventors, as this meant optimum value for Acacia.

18.     Mr. White's message to Mr. Michaels was very clear – Acacia was a NASDAQ-listed company, and as such, Mr. White claimed, Acacia was strictly governed, ethical, honorable, and trustworthy.  Mr. White also explained to Mr. Michaels that Acacia was well-known as a leading expert in the patent enforcement and licensing arena.  Mr. White stated that Mr. Michaels could trust Acacia to look after and protect Plaintiffs' best interests, and that this was the basis and foundation of Acacia's overall business and their relationships with inventors.

19. Indeed, Mr. White's representations and assurances to Plaintiffs in 2007 are consistent with the message that Acacia continues to project in the marketplace to this day. For example, on its website, http://www.acaciaresearch.com, Acacia characterizes its overall mission as "empowering patent owners [and] rewarding invention." Similarly, on a page within its website entitled, "Who We Serve," Acacia explains that it "partners with disenfranchised patent owners [who] hav[e] never received fair compensation for the unauthorized use of [their] patented inventions." Acacia also emphasizes that it "strives to reward patent owners for their creative genius." Additionally, according to its website, Acacia claims that it "has emerged as the leading independent patent licensing company in the secondary market."

20. Before the 2007 agreement was signed, Mr. Michaels and Acacia's Mr. White had clear discussions in which both men acknowledged the importance to the relationship of Acacia refraining from including Plaintiffs' patents in any licenses Acacia might grant to third parties of patents under Acacia's control. Indeed, as Mr. Michaels and Mr. White discussed, such bulk licensing would (a) destroy the value of individual patents and (b) exhaust a patent's value. For these reasons, the non-bundling clause was incorporated into the agreement and agreed between Plaintiffs and Acacia.

21. In 2007, Mr. White asked Mr. Michaels to identify companies Mr. Michaels previously had approached. One of the companies Mr. Michaels identified was Sun, which owned Java, a programming language and computing program – and which Oracle would buy in April 2009. As such, in 2007, Acacia knew about, and, upon information and belief, understood clearly, the relevance of Plaintiffs' intellectual property to Java and Oracle.

22.     It was only on the basis of the promises and assurances that Acacia made to Mr. Michaels that Plaintiffs signed the 2007 agreement.  Acacia's representatives told Mr. Michaels he could trust Acacia, and Plaintiffs believed, and relied upon, Acacia's statements.

23.     Mr. Michaels and Acacia management spoke a number of times in 2007 to discuss Mr. Michaels' concerns over "costs," as defined in the proposed agreement.  Upon information and belief, to address Mr. Michaels' concerns and assuage his reluctance to sign the proposed agreement, Acacia management assured Mr. Michaels that Acacia's costs would be kept to a minimum and would be strictly controlled.  Furthermore, Mr. Michaels was assured by Acacia management that he could rely on Acacia's word and assurance in this regard.  It was only after these assurances that Mr. Michaels signed the November 2007 agreement on behalf of himself and Celltrace Communications Limited.

24.     On November 1, 2007, Plaintiffs entered into an agreement with Acacia for the monetization of the patents (the "Agreement").

25.     The Agreement provided in pertinent part:

a.      Plaintiffs were to receive ███████████████████ ███████████████████████████████████.

b.      "Net Proceeds" were defined as "Total Recoveries" minus "APAC [Acacia Patent Acquisition Corporation] Costs."

c.      Total Recoveries included "all royalties, money and other sums received by Acacia from the licensing, enforcement, sale or commercialization of the Patents including all licensing proceeds, recoveries and damages from any lawsuits or settlements received by APAC."

      d.      "APAC Costs" were defined as conforming with Generally Accepted Accounting Principles ("GAAP") in the United States.

26.      Thus, Acacia was required to share with Plaintiffs all net recovery from Acacia's assertion or licensing of Plaintiffs' patents.

27.      Furthermore, the Agreement contained an "anti-bundling" provision that prohibited Acacia from licensing Plaintiffs' patents in combination with any other patents.

28.      Specifically, Acacia agreed not to combine the licensing or enforcement of Plaintiffs' patents with the inclusion of any other patents in such licensing or enforcement efforts.

29.      The Agreement also contained a "buyback" provision that gave Plaintiffs the right to repurchase the patents from Acacia for a nominal fee following a decision by Acacia that licensing or enforcement of the patents was neither commercially reasonable nor practicable.

30.      The Agreement also contained a "Good Faith" provision that required Acacia to "use its good faith efforts to pursue licensing and enforcement of the Patents at its expense."

**C.     Acacia Asserts Plaintiffs' Patents, Grants Licenses to Plaintiffs' Patents, Sells Plaintiffs' Patents, Recovers Hundreds of Millions of Dollars, Then Pays Nothing to Plaintiffs.**

31.      In July and August, 2009, Acacia caused lawsuits to be filed in the U.S. District Court for the Eastern District of Texas, Tyler Division, asserting Plaintiffs' U.S. patents against several telecommunications providers (the "Patent Suits").

32.      In the Patent Suits, the named plaintiff Celltrace LLC was a company owned by Acacia.  It had been created and controlled by Acacia for the purpose of separately holding and asserting Plaintiffs' patents.

33. In October 2009, while the Patent Suits were underway, Mr. Michaels was asked to send, to Acacia's lawyers, files Mr. Michaels held on his personal computer, which included his files on those "companies contacted" by Plaintiffs.  Among these companies was Sun (which, as noted, had owned Java).

34. In October 2009, Mr. Michaels even discussed this particular issue with David White because of the importance of Java to the Patent Suits.

35. Yet in complete, willful disregard for the 2007 Agreement, Mr. Michaels' specific discussions with and assurances from David White, and the information Mr. Michaels provided to Acacia in the early days of the Patent Suits, Acacia subsequently entered into a license agreement with Oracle.  In that agreement, Acacia, on behalf of itself and its subsidiaries, including Celltrace LLC, granted Oracle a license to any patent in its portfolio, bundling Plaintiffs' patents together with hundreds of patents in Acacia's portfolio.  Plaintiffs' patents were identified in the license agreement.  Acacia specifically granted a license to use Plaintiffs' patents as part of this bundling.  And, upon information and belief, Acacia received $25 million from Oracle.

36. Similarly, in 2010 and 2011, Acacia entered into portfolio-wide license agreements with Microsoft and Samsung.  In each agreement, Acacia, on behalf of itself and its subsidiaries, granted a license to any patent in its portfolio, bundling Plaintiffs' patents together with hundreds of patents in Acacia's portfolio.  Each agreement specifically referenced Plaintiffs' patents, and Acacia specifically granted a license to use Plaintiffs' patents as part of this bundling.  Upon information and belief, these agreements earned Acacia a $40 million payment from Microsoft, and a $45 million payment from Samsung.

37.     Thus, upon information and belief, the total amount of money received by Acacia under these three agreements was at least $110 million.

38.     Despite Acacia's reporting obligations to Plaintiffs, Acacia never told Plaintiffs that their patents had been licensed to Oracle, Microsoft, or Samsung, and in fact intentionally withheld this information from Plaintiffs.

39.     Plaintiffs learned of the licenses only in August 2013, after demanding that Acacia honor its auditing rights and repeatedly surmounting the hurdles Acacia put in their way to block and delay the audit.  By then, however, Acacia had sold Plaintiffs' patents and settled the Patent Suits in bad faith.

40.     Acacia repeatedly stalled, improperly obstructed, and failed to honor Plaintiffs' repeated requests to audit Acacia, despite Plaintiffs having audit rights in the Agreement.  Eventually, Acacia very reluctantly granted Plaintiffs limited access to pertinent materials.  When Plaintiffs finally were able to conduct their audit, Acacia failed to comply with its obligations relating to the audit under the Agreement.

41.     When Plaintiffs asked Acacia about the Oracle, Microsoft, and Samsung transactions, Acacia refused to acknowledge its contractual promise and refused to share any of the (at least) $110 million revenue with Plaintiffs.  Despite knowing to the contrary, Acacia claimed the agreements – each of which specifically identified Plaintiffs' patents – "were not relevant to Celltrace," were not licenses but rather only covenants not to sue, did not relate to Plaintiffs, and were not subject to revenue sharing.  But when Plaintiffs finally were able to have their auditors review the agreements in August 2013, the agreements were found to be licenses, and Acacia's many falsehoods were revealed.

42.     Nor did Acacia tell Plaintiffs that in 2010, Acacia negotiated low settlement agreements with three defendants in the Patent Suits.  When Plaintiffs discovered these settlements, Acacia's David White assured Plaintiffs not to worry about the low settlement figures, because, he explained, these were simply to get some cash in for Acacia and that they did not reflect real value.  Rather, David White confirmed that Acacia were still going for the big awards, and this "was just a tactical and strategic play."  David White told Mr. Michaels to trust him and Acacia, and that he and Acacia knew what they were doing.

43.     All the while, Acacia was telling Plaintiffs, on multiple occasions, that the U.S. Patent Suits were proceeding well, Acacia still was focused on big damages awards, and that a large settlement was expected.  Specifically:

a.      In 2010, Acacia and its lawyers made it clear as to the importance of the *Markman* hearing at which the district court would construe the claims of Plaintiffs' patents.  Acacia and its lawyers reiterated that if the *Markman* hearing went well, then it would significantly increase the value of the case.

b.      In November 2010, Acacia and its lawyers informed Mr. Michaels that the *Markman* hearing had gone very well.

c.      In December 2010, Mr. Michaels contacted David White to discuss the licensing strategy for Plaintiffs' patent portfolio.  Mr. Michaels had heard that Acacia was contemplating another early settlement with a defendant for a low settlement value – news that shocked and perplexed him – and wanted reassurance that such settlement would be upon terms that were highly favorable for Plaintiffs.  Mr. Michaels contacted David White and

asked how in good faith Acacia could validate low settlement figures after the *Markman* hearing.  Mr. White refused to acknowledge any settlement figures.   Mr. Michaels asked repeatedly for clarification and an explanation, but Mr. White remained very evasive, would not admit one way or the other what he was doing, and refused to answer Mr. Michaels' questions.  However, Mr. White again told Mr. Michaels not to worry and to trust David White and Acacia.

d.   Mr. White did acknowledge to Mr. Michaels, again, that this positioning was strategic with respect to the defendants in the Patent Suits, and that Acacia was still going for a big award from the remaining defendants.  He claimed, again, that having fewer defendants remaining in the case meant Acacia could concentrate their efforts, time, and resources more efficiently and be more effective in maximizing value for Plaintiffs.

e.   Mr. Michaels subsequently asked to speak to Les Ware, whom Mr. Michaels had been told was heading up settlement discussions with input from the litigation team.  Mr. Michaels, however, was refused access to Mr. Ware or other relevant Acacia representatives and was prohibited from participating in the discussions.   Mr. White demanded that Mr. Michaels "let it go" and allow Acacia "to do what we know is best."

f.   Acacia never disclosed its licensing agreements and their effect on Plaintiffs' patent portfolio.

g.   In February 2011, Robert Westerlund and Don Puckett of the Ware Law Firm, both representing Acacia, told Mr. Michaels that a damages model

in excess of $100 million was being prepared against defendants in the Patent Suits.

h.   At another time, Mr. Michaels was told the damages model would exceed $150 million.

i.   Acacia never gave Mr. Michaels any contrary updates or lower estimates of the ultimate value of the Patent Suits.

44.   The foregoing statements made by Acacia to Mr. Michaels that it ultimately would maximize the value to Plaintiffs and recover a big damages award echoed prior representations from Acacia to Mr. Michaels about the mutually productive relationship Acacia promised that the companies would enjoy.

45.   Throughout their one-sided business relationship, Acacia's basic admonition to Plaintiffs was, "Trust us."   And Plaintiffs did trust Acacia, and relied upon Acacia's statements.

46.   Plaintiffs depended upon, and were required to depend upon, Acacia in this one-sided business relationship.  Indeed, under the Agreement (subject to the "anti-bundling" provision and Plaintiffs' right to repurchase the patents from Acacia for a nominal fee following a decision by Acacia that licensing or enforcement of the patents was neither commercially reasonable nor practicable):

a.   Acacia had complete discretion, and the exclusive right, to institute actions to enforce Plaintiffs' patents;

b.   Plaintiffs granted Acacia power of attorney to add Plaintiffs as a party or to bring an action in Plaintiffs' name; and

c.  Acacia had the right to settle any claims relating to the Plaintiffs' patents on behalf of the Plaintiffs.

47.  Moreover, Plaintiffs relied upon Acacia's advice based on both Acacia's statements and its superior knowledge about the industry and professional expertise in enforcing and monetizing the patents of inventors such as Plaintiffs.

48.  In April 2011, without any prior notice, Acacia told Plaintiffs that Acacia and the litigant it controlled, Celltrace LLC, would be settling the Patent Suits as to all defendants.

49.  Acacia also told Plaintiffs that the settlement would involve the sale of Plaintiffs' patents to a third-party, RPX Corporation.

50.  Initially, Acacia told Plaintiffs the value of the total settlement, but did not tell Plaintiffs that under Acacia's accounting the total settlement payments received by Acacia would be sufficient to cover Acacia's own costs incurred in connection with the Patent Suits, but insufficient to permit any payment to be made to Plaintiffs.  This specific information only was provided after Mr. Michaels continued to probe further into the settlement.

51.  Mr. Michaels was stunned by the news of the settlement and sale of his patents to RPX, and told Acacia he objected.  After Mr. Michaels pressed for a reason, he initially was told by Acacia that the settlement was due to concerns Acacia had about secret "prior art."  Acacia refused to grant access to much of this information to Mr. Michaels and – even more surprisingly – to two of Acacia's own technical experts, Anthony Timson and Simon Fisher.  Acacia claimed that this information was "attorneys-eyes-only," and that Mr. Michaels, Mr. Timson, and Mr. Fisher were not allowed access to the documents.

52.     In fact, Acacia's explanation was a mere pretext and an act of bad faith, as Acacia had been aware of the alleged prior art issues since 2010, already had analyzed much of this alleged prior art, and had provided Messrs. Timson and Fisher with documents pertaining to the alleged prior art.  Indeed, Acacia had requested a report on this alleged prior art by one of its own experts.  The report contradicted the claims Acacia now made to explain the settlement.  But there was nothing Mr. Michaels could do, as he was ignored by Acacia, whose representatives made it clear that they would be settling the suit regardless of Mr. Michaels' objections.  Mr. Michaels told Acacia that Plaintiffs and Acacia were in a formal dispute and requested arbitration.  Again, he was ignored.  Acacia executed the deal with RPX in blatant disregard of Plaintiffs' objections and requests.

53.     Upon information and belief, Acacia's statement to Plaintiffs that the total recovery from the Patent Suits sufficed only to cover Acacia's costs was based on improper accounting that fails to comply with GAAP standards.

54.     Specifically, upon information and belief, Acacia's accounting of the revenues and costs under the 2007 Agreement included the following significant defects:

      a.     Acacia double-entered on its books a $1.75 million entry it was entitled to recover before making any payment to Plaintiffs;

      b.     Acacia entered a $1 million reserve for future costs on its licensing activity reports for Plaintiffs, and treated this as a "cost" to be deducted from its total recovery associated with enforcement of Plaintiffs' patents; Acacia did not, however, record this entry in its own books and records;

c.    Acacia withheld $279,823 as a "deposit" for a case in a foreign court system involving another company it created, owned and wholly controlled, Celltrace Technologies Ltd.;

d.    Acacia further spent another $200,000 after the sale of Plaintiffs' patents; and

e.    Acacia did not include all its revenue.

55.    Acacia and its foreign subsidiary Celltrace Technologies Ltd. ultimately settled the foreign patent case they had initiated.  But they settled that case without first securing a commitment from the parties they had sued to refrain from seeking costs.  Acacia repeatedly ignored Plaintiffs' written requests for an accounting, which Acacia was contractually obligated to provide at the end of each quarter.  In the end, Acacia sold Plaintiffs' patents to RPX, and refused to share any of the proceeds with Plaintiffs.

56.    Acacia's settlement of the Patent Suits deprived Plaintiffs of the right to receive benefits under the November 2007 Agreement, including the benefits Plaintiffs would have received had Acacia continued to pursue, in good faith, the Patent Suits, which at the time of Acacia's bad-faith settlement were very advanced, including what Acacia had represented was a successful *Markman* hearing and a damages model touted by Acacia as topping nine figures.

57.    Therefore, the net result of the November 2007 Agreement was that Acacia received money for:

a.    settlement of the Patent Suit involving Plaintiffs' patents;

b.    licenses to Acacia's patent portfolio, which included Plaintiffs' patents and which specifically identified Plaintiffs' patents as being licensed; and

c.      the sale of Plaintiffs' patents.

58.      But, despite the language of the November 2007 Agreement, Plaintiffs ultimately received no money, and they lost all of their rights to the valuable patents.

**D.  Plaintiffs Tried to Resolve the Dispute
      Through Negotiation Before Filing Suit.**

59.      Section 7.2 of the 2007 Agreement provides:  "In the event of any dispute and if the Parties cannot resolve the dispute through negotiation, the Parties agree first to try in good faith to settle the dispute by formal arbitration under the Rules of Arbitration of the International Chamber of Commerce [ICC] before submitting the matter to litigation pursuant to Section 7.1."

60.      In good faith, Plaintiffs have discussed this dispute with Acacia's David White on multiple occasions, asking Acacia to compensate Plaintiffs for the harm they suffered through Acacia's actions, and even requested arbitration.  Plaintiffs also contacted Acacia's Dooyong Lee and Acacia's senior management and asked them to help reach an appropriate resolution short of a lawsuit.  Plaintiffs were ignored by them.  Acacia has consistently refused to agree to compensate Plaintiffs for the substantial harm they have suffered, and the parties' discussions have reached an impasse.

61.      The Rules of Arbitration of the International Chamber of Commerce lack any provisions for non-binding arbitration.  Indeed, Article 34(6) of the ICC rules states:  "Every award shall be binding on the parties.  By submitting the dispute to arbitration under the Rules, the parties undertake to carry out any award without delay and shall be deemed to have waived their right to any form of recourse insofar as such waiver can validly be made."  And under Article 31, every dispute submitted to the ICC for arbitration will result in an award.  By

preserving the option of litigating the dispute, the parties to the 2007 Agreement did not agree to a binding resolution by the ICC.

62.     Moreover, the ICC arbitration provisions are inadequate for fair resolution of this dispute, which has divided the parties for years.  For example, under Article 22 ("Conduct of the Arbitration"), the arbitral tribunal may adopt any procedural measure it deems appropriate and may conduct the proceeding confidentially.   Given Acacia's fraudulent conduct and numerous contractual breaches, Plaintiffs are entitled resolve their claims in open court, pursuant to the laws and rules of the State of New York.  Moreover, Article 25 ("Establishing the Facts of the Case") provides the arbitral tribunal full authority to determine whether to "hear witnesses, experts appointed by the parties or any other person, in the presence of the parties, or in their absence provided they have been duly summoned."  Plaintiffs are entitled to employ appropriate litigation discovery tools to uncover evidence in the case and ultimately present their case to a jury.

63.     As such, Plaintiffs have fulfilled their obligation under Section 7.2 of the 2007 Agreement to try to resolve the dispute through negotiation before submitting the matter to litigation pursuant to Section 7.1.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

64.     Plaintiffs repeat and incorporate the allegations in the foregoing paragraphs as if set forth fully herein.

65.     The Agreement between Plaintiffs and Acacia is a valid and enforceable contract between and among the parties.

66.     Acacia breached the Agreement by failing to perform its obligations and, moreover, in failing to perform its obligations in good faith.  Among other things:

a.     Acacia granted licenses to Oracle, Microsoft, Samsung and others that specifically referenced Plaintiffs' patents and specifically purported to grant those entities a license to Plaintiffs' patents. These licenses removed opportunity and value for Plaintiffs and were detrimental to and damaged Plaintiffs. This action breached the "anti-bundling" provision in the Agreement, which barred Acacia from combining the licensing or enforcement of Plaintiffs' patents with the inclusion of any other patents in any licensing or enforcement efforts. These licenses furthermore breached both Acacia's express duty to use good faith efforts to pursue licensing and enforcement of Plaintiffs' Patents, and the implied covenant of good faith and fair dealing that inheres in every contract governed by New York law.

b.     Acacia's accounting failed to comply with U.S. GAAP in calculating Acacia Costs, so that Acacia inaccurately and fraudulently calculated Net Proceeds and withheld from Plaintiffs the share of Net Proceeds to which Plaintiffs were entitled. Acacia intentionally misrepresented and manipulated its records with respect to Plaintiffs' portfolio for its own enrichment and benefit and to Plaintiffs' disadvantage. Acacia is responsible for the costs and penalties due against it under the Agreement based on the findings of Plaintiffs' audit.

c.     Moreover, Acacia refused to share with Plaintiffs any of the sums they received in exchange for these licenses, which sums should be part of the Total Recoveries under the Agreement, and which should lead to the creation of Net Proceeds to which Plaintiffs are entitled to a share.

d.     Acacia sold Plaintiffs' patents to RPX in violation of the buyback provision, which entitled Plaintiffs to repurchase their patents in the event Acacia decided that further enforcement of Plaintiffs' patents was commercially unreasonable or impracticable.

e.     Acacia's settlement of the Patent Suits under the pretext of prior art concerns was in bad faith, and breached both Acacia's express duty to use good faith efforts to pursue licensing and enforcement of Plaintiffs' Patents, and the implied covenant of good faith and fair dealing that inheres in every contract governed by New York law.  Acacia's settlement of the Patent Suits deprived Plaintiffs of the right to receive benefits under the November 2007 Agreement, including the benefits Plaintiffs would have received had Acacia continued to pursue, in good faith, the Patent Suits, which at the time of Acacia's bad-faith settlement were very advanced, including what Acacia had represented was a successful *Markman* hearing and a damages model touted by Acacia as topping nine figures.

f.      Acacia failed to pay to Plaintiffs all amounts due within 30 days after the end of each calendar quarter.

g.      Acacia failed to comply with its audit obligations and pay the penalties associated with Plaintiffs' successful audit.

67.     Plaintiffs have fully performed their own obligations under the Agreement.  All conditions precedent to the Agreement have been performed.

68.     As a direct result of Acacia's breaches of its contract duties, Plaintiffs suffered damages and incurred additional costs, in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Unjust Enrichment)

69.     Plaintiffs repeat and incorporate the allegations in the foregoing paragraphs as if set forth fully herein.

70.     Acacia obtained an unjust financial benefit by licensing Plaintiffs' patents and selling Plaintiffs' patents, while denying Plaintiffs a share in the income Defendants received from their misuse of Plaintiffs' patents.

71.     The benefit that accrued to Acacia came at the expense of Plaintiffs, who lost the right to exclude the licensees from the use of Plaintiffs' patented inventions, and who ultimately lost their ownership rights in Plaintiffs' own patents.

72.     Acacia leveraged and exploited Plaintiffs' patents for Acacia's own personal gain and at the expense of Plaintiffs.

73.     Equity and good conscience require the restitution of Defendants' ill-gotten gains.

### THIRD CAUSE OF ACTION
#### (Fraud)

74.     Plaintiffs repeat and incorporate the allegations in the foregoing paragraphs as if set forth fully herein.

75.     As set forth above, Defendants repeatedly stated to Acacia that Plaintiffs could, and should, trust Acacia, and stated that Acacia was ethical, honorable, and trustworthy. Consequently, Plaintiffs reposed trust and confidence in Acacia and relied upon Acacia's integrity and fidelity to inventors such as Plaintiffs.

76.     As also set forth above, Defendants had discretion to bring actions on Plaintiffs' behalf, negotiate on Plaintiffs' behalf, and ultimately settle on Plaintiffs' behalf. Plaintiffs relied upon Acacia's advice based on both Acacia's statements and its superior knowledge about the industry and professional expertise in enforcing and monetizing the patents of inventors such as Plaintiffs.

77.     Acacia told Plaintiffs that partnering with it would result in the highest maximization of value for Plaintiffs' patents.  Acacia told Plaintiffs that their interests were aligned and that Acacia made money when Plaintiffs made money.  Acacia also told Plaintiffs that the case was proceeding well, that the damages model for the Patent Suits was coming out to around $150 million, and that the damages model was aligning with the values that had been discussed and understood between Acacia and Plaintiffs since their earliest conversations, even before the execution of the 2007 Agreement.

78.     Acacia told Plaintiffs that the Acacia portfolio agreements with Oracle, Microsoft, and Samsung were not relevant to Plaintiffs, and that the Plaintiffs' patents were not licensed to those companies.  In addition, Acacia provided false financial reports that intentionally omitted revenues and included inappropriate costs.

79.    Acacia intended for Plaintiffs to rely on those representations to keep Plaintiffs from discovering the revenues attributable to the Plaintiffs' patents that Acacia did not want to share with the Plaintiffs, and to hide its breach of the anti-bundling provision of the Agreement.

80.    Acacia's representations were false.  While Acacia represented (among other things) that Acacia's interests were aligned with Plaintiffs' interests, their interests were not aligned.  Moreover, while Acacia represented that Acacia would try to maximize the value of Plaintiffs' patents, Acacia did not try to maximize their value; rather, Acacia, sought to build up Acacia's own portfolio as large as possible to capture portfolio-wide revenues themselves, without sharing those revenues with Plaintiffs.   Acacia's representations and conduct intentionally damaged Plaintiffs.   Among other things, the value of Plaintiffs' patents was reduced as a result of Acacia's licensing them (without notifying Plaintiffs) to Oracle, Microsoft, and Samsung, and by Acacia's settling the Patent Suits for a sum that made Acacia whole but left nothing for Plaintiffs.

81.    Acacia intended Plaintiffs to rely on Acacia's representations, and Plaintiffs did rely on those representations.

82.    Plaintiffs relied to their detriment on Acacia's representations, and were damaged by Acacia's false representations.

83.    Acacia's actions amount to willful misconduct, bad faith, and malicious behavior.

84.    Acacia's false representations to Plaintiffs did not accrue until Plaintiffs were damaged through the loss of the value of Plaintiffs' patent portfolio, and indeed, the loss of the entire portfolio itself, when Acacia settled the Patent Suits in 2011.  Plaintiffs learned of

Acacia's false representations through their July/August 2013 audit of Acacia, after Acacia improperly deceived, delayed and prevented Plaintiffs from conducting an audit earlier.

85.     Upon information and belief, Defendants acted with malicious and reprehensible motives.  Further, certain of Defendants' misrepresentations – including (among others) Defendants' alignment in interest with inventors, Defendants' practice of sharing with inventors revenue Defendants received from licensing those inventors' patents, Defendants' practice of and commitment to vigorously enforcing those inventors' patents against infringers, and Defendants' commitment to being ethical, honorable, and trustworthy – were made to other inventors who similarly partnered with Defendants, as well as to the general public, through the Internet, marketing literature, and other means.

86.     Upon information and belief, Defendants were aware that Plaintiffs (and numerous other inventors) relied upon their misrepresentations, but concealed from Plaintiffs the revenues attributable to the Plaintiffs' patents that Acacia did not want to share with the Plaintiffs, and engaged in other egregious misconduct, as described above; upon information and belief, Acacia engaged in similar misconduct with other inventors as well.  Acacia's misconduct, aimed at the public, evinces a high degree of moral turpitude and wanton dishonesty.

87.     Given the foregoing, Plaintiffs are entitled to punitive damages, which resulted from Acacia's misrepresentations and other misconduct.

### FOURTH CAUSE OF ACTION
#### (Fraud in the Inducement)

88.     Plaintiffs repeat and incorporate the allegations in the foregoing paragraphs as if set forth fully herein.

89.     As set forth above, before Plaintiffs entered into the Agreement (as well as subsequently), Defendants repeatedly stated to Acacia that Plaintiffs could, and should, trust

Acacia, and stated that Acacia was ethical, honorable, and trustworthy.  Consequently, in reliance on these statements and others (as set forth below), Plaintiffs trusted Acacia and entered into the Agreement – which provided Defendants with discretion to bring actions on Plaintiffs' behalf, negotiate on Plaintiffs' behalf, and ultimately settle on Plaintiffs' behalf.

90.    Acacia induced Plaintiffs to enter into the November 2007 Agreement by, among other things, promising not to combine the licensing or enforcement of Plaintiffs' patents with the inclusion of any other patents in such licensing or enforcement efforts.  Acacia represented that it would follow its strict procedures to ensure Plaintiffs' patents would not be bundled with other Acacia-controlled patents, including assigning Plaintiffs' patents to separate subsidiaries.

91.    Acacia intended Plaintiffs to rely on Acacia's promise, and Plaintiffs did rely on that promise in deciding to enter the November 2007 Agreement.

92.    Acacia never intended to comply with that promise, and did not comply with it.  Acacia's representations were false.  While Acacia assured Plaintiffs that Acacia would protect and maximize the value of Plaintiffs' patents, Acacia had no procedures that protected Plaintiffs' patents, and assigning Plaintiffs' patents to a separate subsidiary of Acacia did not protect them.  Acacia knowingly pursued a strategy making the patents valuable to Acacia but worthless to Plaintiffs.  Acacia bundled the licensing of Plaintiffs' patents with the remainder of Acacia's patent portfolio (without notifying Plaintiffs), in license agreements that garnered Acacia at least $110 million and irreparably harmed the value of Plaintiffs' patents.

93.    Acacia's subsequent license of Plaintiffs' patents destroyed their value to Plaintiffs and further damaged the chance of success in the Patent Suits.  Acacia executed the licenses to Oracle, Microsoft, and Samsung covertly, intentionally hid this from Plaintiffs, and

when discovered, misrepresented to Plaintiffs the relevance of the licenses for Acacia's own benefit and to the detriment of Plaintiffs.   Acacia also misrepresented the transactions as covenants-not-to-sue when in fact they were licenses.   All of this was done to mislead and deceive Plaintiffs and hide the fraud.   Further, Acacia caused Plaintiffs to lose their patents to RPX.

94.      Plaintiffs relied to their detriment on Acacia's representations, entered into the November 2007 Agreement in reliance on Acacia's representations, and have been damaged by Acacia's false representations.

95.      Acacia's false representations to Plaintiffs did not accrue until Plaintiffs were damaged through the loss of the value of Plaintiffs' patent portfolio, and indeed, the loss of the entire portfolio itself, when the Acacia settled the Patent Suits in 2011.  Plaintiffs learned of Acacia's false representations through their July/August 2013 audit of Acacia, after Acacia improperly deceived, delayed and prevented Plaintiffs from conducting an audit earlier.

96.      Upon information and belief, Defendants acted with malicious and reprehensible motives.  Further, certain of Defendants' misrepresentations – including (among others) Defendants' alignment in interest with inventors, Defendants' practice of sharing with inventors revenue Defendants received from licensing those inventors' patents, Defendants' practice of and commitment to vigorously enforcing those inventors' patents against infringers, and Defendants' practice of and commitment to being ethical, honorable, and trustworthy – were made to other inventors who similarly partnered with Defendants, as well as to the general public, through the Internet, marketing literature, and other means.

97.      Upon information and belief, Defendants were aware that Plaintiffs (and numerous other inventors) relied upon their misrepresentations, but concealed from Plaintiffs the

revenues attributable to the Plaintiffs' patents that Acacia did not want to share with the Plaintiffs, and engaged in other egregious misconduct, as described above; upon information and belief, Acacia engaged in similar misconduct with other inventors as well.  Acacia's misconduct, aimed at the public, evinces a high degree of moral turpitude and wanton dishonesty.

98.     Given the foregoing, Plaintiffs are entitled to punitive damages, which resulted from Acacia's misrepresentations and other misconduct.

## **JURY DEMAND**

Plaintiffs demand a trial by jury of all material disputed fact issues.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that final judgment by entered in its favor and against Acacia awarding Plaintiffs the following relief:

1.     All actual, special, indirect, and consequential damages to which Plaintiffs are entitled;

2.     Exemplary and punitive damages due to Acacia's wrongful and egregious conduct;

3.     All costs of this action and reasonable attorney fees that Plaintiffs incur in prosecuting this action;

4.     Pre- and post-judgment interest as permitted by law; and

5.     All other and additional relief to which Plaintiffs may show themselves to be justly entitled, whether at law or in equity.

Dated:  August 7, 2015
        New York, New York

                                   Respectfully submitted,


                                   BRYAN CAVE LLP


                              By:   _/s/ Joseph J. Richetti_____
                                   Joseph J. Richetti
                                   Erik Wolff Kahn
                                   Thomas J. Schell
                                   1290 Avenue of the Americas
                                   New York, New York 10104
                                   Tel: (212) 541-2000
                                   Fax: (212) 541-1462
                                   joseph.richetti@bryancave.com
                                   erik.kahn@bryancave.com
                                   tjschell@bryancave.com


                                   *Of counsel*:

                                   R. Paul Yetter*
                                   Collin J. Cox*
                                   Thomas M. Morrow*
                                   Christopher R. Johnson*
                                   Elizabeth Wyman*
                                   YETTER COLEMAN LLP
                                   909 Fannin, Suite 3600
                                   Houston, Texas 77010
                                   (713) 632-8000
                                   (713) 632-8002 (Fax)
                                   pyetter@yettercoleman.com
                                   ccox@yettercoleman.com

                                      *(Motions to appear pro hac vice forthcoming)*

                                   *Attorneys for Plaintiffs Celltrace
                                   Communications Limited and Wayne Michaels*