UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Celltrace Communications Ltd. *et al.*,

               Plaintiffs,

–v–

Acacia Research Corp. *et al.*,

               Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: JUN 16 2016

15-CV-4746 (AJN)

MEMORANDUM AND ORDER

ALISON J. NATHAN, District Judge:

Celltrace Communications Ltd. and Wayne Michaels ("Plaintiffs") filed the above-captioned action against Acacia Research Corp. and Acacia Research Group, LLC ("Defendants") on June 17, 2015. Dkt. No. 1. Before the Court is Defendants' motion to compel arbitration. Dkt. No. 48. For the reasons articulated below, Defendants' motion is granted.

I.  **BACKGROUND**

On November 1, 2007, Plaintiffs entered into a contract with Defendants' predecessor-in-interest for the assignment of certain patent rights. Dkt. No. 50 ¶ 3. This contract provides that the parties "irrevocably consent to the exclusive jurisdiction of any New York state or federal court over any suit, action or proceeding arising out of or relating to this Agreement." *Id.* Ex. A ("Agreement") § 7.1. Section 7.2 of the contract further provides:

> In the event of any dispute and if the Parties cannot resolve the dispute through negotiation, the Parties agree first to try in good faith to settle the dispute by formal arbitration under the Rules of Arbitration of the International Chamber of Commerce ["ICC Rules"] before submitting the matter to litigation pursuant to Section 7.1 above.

*Id.* § 7.2.

1

In 2015, Plaintiffs brought breach of contract, unjust enrichment, and fraud claims against Defendants related to the 2007 contract. Dkt. No. 1 ("Comp.") ¶¶ 43-68. Defendants responded by moving to compel arbitration based on Section 7.2 of the Agreement and the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.* Dkt. Nos. 48, 49.

## II.   LEGAL STANDARD

The FAA "requires courts to enforce privately negotiated agreements to arbitrate . . . in accordance with their terms." *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989). Because "[a]rbitration is a matter of contract . . . a party cannot be required to submit to arbitration any dispute which [it] has not agreed so to submit." *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 126 (2d Cir. 2010) (quoting *JLM Indus., Inc. v. Stolt–Nielsen SA*, 387 F.3d 163, 171 (2d Cir. 2004)). As a result, when a court evaluates a motion to compel arbitration pursuant to the FAA, it "must answer two questions: (1) whether the parties agreed to arbitrate, and, if so, (2) whether the scope of that agreement encompasses the claims at issue." *Holick v. Cellular Sales of New York, LLC*, 802 F.3d 391, 394 (2d Cir. 2015) (quoting *Bank Julius Baer & Co. v. Waxfield Ltd.*, 424 F.3d 278, 281 (2d Cir. 2005)). If the Court finds that arbitration is required, the Court may issue "an order directing that such arbitration proceed in the manner provided for in such agreement" provided that the arbitration occur "within the district in which the petition for an order directing such arbitration is filed." 9 U.S.C. § 4. Upon ordering arbitration, the Court may stay the case, *see* 9 U.S.C. § 3, or exercise its discretion to dismiss the case without prejudice if "all of the disputes raised in the plaintiff's complaint in this case are subject to arbitration." *Nulife Entm't, Inc. v. Torres*, 698 F. Supp. 2d 409, 414 (S.D.N.Y. 2010).

III.    **DISCUSSION**

Plaintiffs oppose Defendants' efforts to compel arbitration. In doing so, Plaintiffs do not argue that their claims are outside of the scope of the arbitration agreement; instead, they argue that there is no agreement to submit claims to mandatory, binding arbitration. Dkt. No. 55 ("Opp. Br.") at 1-2, 6. In support of this argument, Plaintiffs point to the Agreement's repeated references to litigation and its "good faith" clause. The Court must first consider whether Plaintiffs' arguments should be resolved by the Court or by an arbitrator. If these arguments are properly for the Court, the Court will consider them in turn.

A.    **The Court Will Decide Arbitrability**

"Under the FAA, there is a general presumption that the issue of arbitrability," which includes the "existence, validity and scope" of an arbitration agreement, "should be resolved by the courts." *Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 208, 211 (2d Cir. 2005) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944-45 (1995)). In certain circumstances, however, arbitrability may be resolved by the arbitrator. The Second Circuit has explained that the relevant inquiry is whether the parties' arbitration agreement reveals an intent to arbitrate arbitrability. *See id.* at 211 (courts should evaluate whether "there is *clear and unmistakable* evidence from the arbitration agreement . . . that the parties intended that the question of arbitrability shall be decided by the arbitrator."); *see also Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 122 (2d Cir. 2003) (courts must consider "the parties' intent to arbitrate arbitrability").

There is some amount of circularity inherent in this standard, particularly when the relevant arbitrability question is the existence of an arbitration agreement. After all, in order to evaluate whether "there is clear and unmistakable evidence from the arbitration agreement . . .

3

that the parties intended that the question of arbitrability shall be decided by the arbitrator," *Contec*, 398 F.3d at 211 (emphasis omitted), the Court must conclude that there was an agreement to arbitrate. Similarly, it is impossible to evaluate "the parties' intent to arbitrate [the specific issue of] arbitrability" without resolving the bigger question of whether there was an intent to arbitrate at all. *Shaw*, 322 F.3d at 122. Perhaps unsurprisingly, then, evaluating intent to arbitrate arbitrability overlaps considerably with evaluating the existence of an arbitration agreement. *See id.* (identifying "certain principles of New York contract law relevant to determining whether an arbitration agreement clearly and unmistakably demonstrates that arbitrators rather than the courts are to resolve questions of arbitrability"). Using this framework, courts frequently find questions of arbitrability delegated to an arbitrator in disputes involving the scope of an admittedly valid arbitration agreement, *see PRL USA Holdings, Inc. v. United States Polo Ass'n, Inc.*, No. 14-CV-764 (RJS), 2015 WL 1442487, at *3-*4 (S.D.N.Y. Mar. 27, 2015); *Offshore Expl. & Prod. LLC v. Morgan Stanley Private Bank, N.A.*, 986 F. Supp. 2d 308, 315-16 (S.D.N.Y. 2013), *aff'd*, 626 F. App'x 303 (2d Cir. 2015), or disputes as to whether successors-in-interest are bound by admittedly valid arbitration agreements signed by their predecessors. *See Contec,* 398 F.3d at 209, 211; *Shaw*, 322 F.3d at 118, 122. In cases factually similar to this case, however, where one party argues that there is no valid arbitration agreement, courts have decided the question of arbitrability. *See Applied Energetics, Inc. v. NewOak Capital Markets, LLC*, 645 F.3d 522, 524-25 (2d Cir. 2011); *Bank Julius Baer & Co. v. Waxfield Ltd.*, 424 F.3d 278, 281-82 (2d Cir. 2005), *abrogated on other grounds by Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287 (2010). Because the Court cannot evaluate intent to arbitrate arbitrability without resolving whether the parties have agreed to engage in

4

binding arbitration, the Court will follow the latter line of cases and independently evaluate arbitrability.

### B. The Agreement Evidences an Intent to Initiate Binding Arbitration To Resolve Disputes

As noted above, Section 7.2 of the Agreement provides that "[i]n the event of any dispute and if the Parties cannot resolve the dispute through negotiation, the Parties agree first to try in good faith to settle the dispute by formal arbitration under the [ICC Rules] before submitting the matter to litigation pursuant to Section 7.1 above." Defendants, invoking the presumption in favor of arbitration, focus on the first part of this provision and argue that the Agreement's clear invocation of formal ICC arbitration demonstrates the parties' intent to submit to binding arbitration. Dkt. No. 49 ("Br.") at 14-19. Plaintiffs raise two arguments in response. First, they argue that they have no obligation to actually engage in arbitration, but are instead only obligated to "try in good faith" to arbitrate. Opp. Br. at 13-15. Second, Plaintiffs argue that "if an arbitration occurred, it would be non-binding." *Id*. at 2. These two specific claims serve Plaintiffs' overarching argument that "the Agreement contemplates non-binding arbitration as a settlement mechanism." Opp. Br. at 18; *see also* Opp. Br. at 4 (describing their obligation under the Agreement as one to "try to settle to avoid litigation through a good-faith effort at non-binding ADR steps") (internal quotations omitted). The Court will first address Plaintiffs' argument that the parties' Agreement calls for non-binding arbitration and will then resolve the question of what it means to "try in good faith" to arbitrate.

#### 1. The Agreement contemplates binding arbitration despite some references to litigation

Plaintiffs argue that the Agreement's forum selection clause and references to the possibility of subsequent litigation illustrate that the parties did not intend to engage in *binding*

5

arbitration.[1]  Opp. Br. at 6-13.  This position is unpersuasive.  As a threshold matter, Plaintiffs are correct that the presumption in favor of arbitration does not apply here, as this dispute concerns "whether an agreement to arbitrate has been made" rather than the scope of an admittedly valid arbitration agreement.  *Applied Energetics*, 645 F.3d at 526.  This fact, however, does not end the inquiry; the Court must still apply state contract law principles to determine "whether a contractual obligation to arbitrate exists."  *Id.*  New York contract law requires that "[a] contract . . . be construed so as to give full meaning and effect to all of its provisions."  *Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 (2d Cir. 2003) (citation omitted).  For this reason, courts should avoid interpretations of contractual language that "render[] meaningless or useless" certain terms of the contract.  *Thomas Crimmins Contracting Co. v. City of New York*, 542 N.E.2d 1097, 1100 (N.Y. 1989).

Plaintiffs' proposed interpretation runs afoul of this principle.  As noted above, Section 7.2 provides that the parties must "first to try in good faith to settle the dispute by formal arbitration under the [ICC Rules] before submitting the matter to litigation."  The ICC Rules only permit binding arbitration.  *See* International Chamber of Commerce, Rules of Arbitration ("ICC Rules") art. 34(6), available at http://www.iccwbo.org/products-and-services/arbitration-and-adr/arbitration/icc-rules-of-arbitration/ ("Every award shall be binding on the parties.  By submitting the dispute to arbitration under the Rules, the parties undertake to carry out any award without delay. . . ."); *see also* Dkt. No. 56 Ex. 7 at 7.  As a result, Plaintiffs' proposed

---

[1] In addition to contractual language, Plaintiffs points to prior drafts of the contract and an email from Plaintiff Michaels to Defendants to support this argument. Opp. Br. at 11-13. This extrinsic evidence is intended to demonstrate that the parties contemplated non-binding, rather than binding, arbitration. *Id.* Such evidence may be inadmissible parol evidence if offered to contradict the contract's reference to binding arbitration under ICC rules. *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc'y*, 769 F.3d 807, 816 (2d Cir. 2014) (quoting *Jarecki v. Shung Moo Louie*, 745 N.E.2d 1006, 1009 (N.Y. 2001)). Even if this extrinsic evidence could be considered "to illuminate an ambiguous contractual term," *see id.*, it does not resolve the ambiguity here but instead serves as a further example of the tension between references to both formal, binding ICC arbitration and subsequent litigation. Because this evidence may be inadmissible and does not resolve any contractual ambiguity, the Court does not consider it.

construction of the Agreement as requiring non-binding arbitration, "would . . . render[] meaningless or useless," if not flatly contradict, the parties' agreement to arbitrate under the ICC Rules. *Crimmins*, 542 N.E. 2d at 1100.

Defendants' proposed construction does not suffer from this flaw. In their view, the Agreement requires the parties to pursue binding arbitration and provides that, to the extent that any party initiates subsequent litigation to enforce or invalidate the arbitration award, it must do so in New York. Dkt. No. 59 at 8-10. The Second Circuit adopted a similar construction of an arbitration agreement in *Bank Julius Baer & Co. v. Waxfield Ltd.*, 424 F.3d 278 (2d Cir. 2005), *abrogated on other grounds by Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287 (2010), where it held that, because litigation frequently follows arbitration, inclusion of a forum selection clause and reference to subsequent litigation were *not* inconsistent with a mandatory binding arbitration clause. *Id.* at 283-84. In so holding, the Second Circuit explained that although the parties were, under the contract, "required to arbitrate their disputes," a party could subsequently "file[] a suit in court . . . to challenge the validity or application of the arbitration agreement." *Id.* at 285; *see also Applied Energetics*, 645 F.3d at 525 ("The Court in *Bank Julius* concluded that the forum selection clause in the . . . agreement could be read as complementary, rather than contradictory, to the parties' . . . agreement to arbitrate.").

These Second Circuit cases demonstrate that the best way to construe the Agreement currently before the Court "so as to give full meaning and effect to all of its provisions," *Shaw*, 322 F.3d at 121, is the way the Second Circuit construed the relevant agreements in *Bank Julius*: "the [parties] are required to arbitrate their disputes" pursuant to ICC Rules, but may subsequently "file[] a suit in court . . . to challenge the validity or application of the arbitration agreement" and must do so in New York. *Bank Julius*, 424 F.3d at 285. Even without the

7

benefit of a presumption in favor of arbitration, Defendants' interpretation is the only interpretation that gives meaning to both the Agreement's invocation of formal ICC arbitration *and* references to the possibility of subsequent litigation in New York.

Plaintiffs dispute this conclusion and point instead to the decision of the New York Court of Appeals in *Crimmins*, 542 N.E.2d 1079, which Plaintiffs describe as holding that "a dispute resolution procedure comparable to the one at issue here" did not "eliminate the right to litigation." Opp. Br. at 9-10. *Crimmins* did not involve an arbitration clause. Instead, the question in that case was whether an alternative dispute mechanism empowering an engineer to resolve certain factual disputes precluded the parties from challenging the engineer's legal conclusions in court. *Crimmins*, 542 N.E.2d at 1098-99. Because the Court of Appeals found that the engineer's legal conclusions were *not* binding on the parties, it held that the parties retained the right to litigate. *Id.* at 1099. A very different question is currently before the Court, and that question is whether references to the possibility of subsequent litigation are inconsistent with binding ICC arbitration. *Crimmins* has little, if any, relevance to the resolution of this issue. In light of the Second Circuit's analysis in *Bank Julius* and *Applied Energetics* discussed above, the Court maintains that Defendants' interpretation of the Agreement best "give[s] full meaning and effect to all of its provisions." *Shaw*, 322 F.3d at 121.

### 2. The parties have not discharged their obligation to "try in good faith" to initiate formal arbitration under the ICC Rules

Plaintiffs next argue that the Agreement does not impose an absolute requirement to arbitrate, but rather only requires that the parties "try to settle . . . through a good-faith effort" at arbitration. Opp. Br. at 14 (internal quotation marks omitted); *see also* Agreement § 7.2 (requiring that the parties "try in good faith to settle the dispute by formal arbitration under the [ICC Rules]"). Plaintiffs further argue that they discharged this obligation when they sent an

8

email to Defendants requesting arbitration in 2011. *See* Opp. Br. at 4-5, 15; *see also* Dkt. No. 56 Ex. 9 ("As per the terms of the Agreement between Acacia Research and Celltrace Communications Ltd we are requesting Arbitration."). Plaintiffs do not cite authority from any American court in support of either of these claims.

There are surprisingly few cases describing what it means to "try in good faith" to accomplish a task. The available cases, however, suggest that to "try in good faith" means having "exhausted all the possibilities" for accomplishing the stated goal but nevertheless failing due to some "formidable obstacle." *Shredded Wheat Co. v. Humphrey Cornell Co.*, 250 F. 960, 966 (2d Cir. 1918) (Hand, J.); *see also United States v. Patterson*, 219 F.2d 659, 664 (2d Cir. 1955) (a party "tried in good faith to bring about compliance with the subpoena" but "the records sought were unavailable"); *Borges v. Adm'r For Strong Mem'l Hosp*, No. 99-CV-6351 (FE), 2002 WL 31194558, at *7 (W.D.N.Y. Sept. 30, 2002) ("tr[ying] in good faith" requires that one "act diligently"); *Paxall Circle Mach. v. My Brands, Inc.*, No. 89-CV-3008 (RWS), 1989 WL 86039, at *1 (S.D.N.Y. July 27, 1989) ("tr[ying] in good faith" is akin to "due diligence").

Plaintiffs' conduct does not meet these requirements. Here, as noted above, the parties had an obligation "to try in good faith to settle [any] dispute by formal arbitration under the [ICC Rules]." Agreement § 7.2. ICC Rules provide a specific mechanism for initiating arbitration: "A party wishing to have recourse to arbitration . . . shall submit its Request for Arbitration . . . to the Secretariat" of the ICC. ICC Rules art. 4(1). While Plaintiffs rightly point out that the Agreement does not necessarily require *completion* of arbitration proceedings, it does require *pursuit* of formal arbitration under the ICC Rules in good faith. *See* Agreement § 7.2. In light of the procedures described in the ICC Rules, the Court concludes that, at a minimum, "try[ing] in good faith" to initiate arbitration proceedings under the ICC Rules requires the submission of a

9

formal request to the Secretariat.  Rather than submit such a request, Plaintiffs sent an email to Defendants in 2011 "requesting Arbitration."  *See* Opp. Br. at 4-5, 15; *see also* Dkt. No. 56 Ex. 9.  Sending a single email in lieu of following the procedure expressly provided in the ICC Rules falls far short of "exhaust[ing] all the possibilities" to arbitrate due to some "formidable obstacle." *Shredded Wheat Co.*, 250 F. at 966 (Hand, J.).  For this reason, the Court concludes that Plaintiffs have not discharged their obligation "to try in good faith to settle the dispute by formal arbitration under the [ICC Rules]."  Agreement § 7.2.

The Court does not suggest that merely sending a formal request to the Secretariat is sufficient to satisfy the obligation "to try in good faith to settle the dispute by formal arbitration under the [ICC Rules]."  Agreement § 7.2.  For example, Plaintiffs cannot file a formal request with the ICC Secretariat, refuse to further participate in arbitration proceedings, and come back to federal court; doing so would clearly not be "in good faith."  Instead, the Court concludes that the parties have an obligation to pursue in good faith the ultimate resolution of their disputes by formal arbitration.  Although unforeseen developments could theoretically prevent the parties from completing the arbitration process, the parties must "exhaust[] all the possibilities" to arbitrate but fail due to some "formidable obstacle" before they may resort to litigation. *Shredded Wheat Co.*, 250 F. at 966 (Hand, J.).

Resisting this conclusion, Plaintiffs cite a single decision by the Queen's Bench Division Commercial Court in England.  Opp. Br. at 14-15 (citing *Kruppa v. Benedetti*, Dkt. No. 56 Ex. 10).  The provision at issue in that case required that the parties "endeavour to first resolve the matter through Swiss arbitration" and further provided that "[s]hould a resolution not be forthcoming the courts of England shall have non-exclusive jurisdiction."  Dkt. No. 56 Ex. 10 ¶ 2.  Interpreting this language, the English court noted that "what the parties had in mind was

that there should be an *attempt to agree to a form of arbitration* between them in Switzerland," not an agreement to actually engage in arbitration. *Id.* ¶ 12 (emphasis added). Here, however, unlike in *Kruppa*,[2] the parties have already agreed to a specific form of arbitration—Section 7.2 of the Agreement specifically invokes arbitration under the ICC Rules. For this reason, Kruppa does not change the Court's conclusion that Plaintiffs have failed to uphold their contractual obligation to, at a minimum, try in good faith to settle their dispute through ICC arbitration by sending a formal request to the ICC Secretariat.

***

As Plaintiffs recognize in their opposition brief, if "parties have agreed to arbitrate under certain rules . . . a court may not order arbitration under different circumstances." Opp. Br. at 18. Although Plaintiffs characterize their Agreement as adopting "non-binding arbitration as a settlement mechanism," *id.*, the Agreement specifically contemplates arbitration under the ICC Rules, which provide for binding arbitration. The Court's interpretation of the Agreement, consistent with the Second Circuit's decision in *Bank Julius*, gives meaning to this reference to binding arbitration as well as references to possible litigation. The Agreement obligates the parties "to try in good faith to settle the dispute by formal arbitration," Agreement § 7.2, which requires, at a minimum, sending a request to the ICC Secretariat to initiate arbitration and continuing to act in good faith to complete the arbitration process. Because Plaintiffs have not complied with their arbitration obligations under the Agreement, they may not litigate their dispute before the Court.

---

[2] The Court also notes that the observation in *Kruppa* that binding arbitration followed by litigation "is logically not possible," Dkt. No. 56 Ex. 10 ¶ 12, is inconsistent with the Second Circuit's decision in *Bank Julius*.

11

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to compel arbitration within the Southern District of New York is granted. *See* 9 U.S.C. § 4. "Because all of the disputes raised in [Plaintiffs'] complaint in this case are subject to arbitration," the case is dismissed without prejudice. *Nulife Entm't, Inc. v. Torres*, 698 F. Supp. 2d 409, 414 (S.D.N.Y. 2010).

This resolves Dkt. No. 48. The Clerk of Court is directed to close the case.

SO ORDERED.

Dated: June 16, 2016
New York, New York

_____
ALISON J. NATHAN
United States District Judge